UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MARIO ARREOLA ALVARADO,

    Defendant.

_____/

Case No. 16-20748

SENIOR UNITED STATES DISTRICT
JUDGE ARTHUR J. TARNOW

MAGISTRATE JUDGE R. STEVEN
WHALEN

**AMENDED OPINION AND ORDER GRANTING MOTION TO SUPPRESS EVIDENCE [22][1]**

On February 7, 2017, Defendant Mario Arreola-Alvarado filed a Motion to Suppress Evidence [22] seized from the October 31, 2016 search of his home at 836 Melrose Street in Pontiac, Michigan. The Government responded on March 3, 2017 [23] and the Court heard testimony and observed evidence at the hearing on April 14, 2017.

At approximately 11:30 PM on October 31, 2016, DEA agents went to

---

[1] This Amended Opinion and Order serves to correct certain formatting and typographical errors in the May 30, 2017 Opinion and Order [28]. It was important to file the Opinion and Order as quickly as possible given that Defendant's liberty interests are at stake.

Defendant's home at 836 Melrose Street. The Government claims that Defendant and Monica consented to a search of their home. The Government contends that after the unsuccessful walk-through search of the house, Defendant and Monica consented to a search of the detached garage. It was there that the agents found approximately seven kilograms of heroin and one kilogram of cocaine inside a workbench.

For the reasons explained below, Defendant's Motion to Suppress Evidence [22] is **GRANTED.** Neither the evidence seized from the Melrose Street residence, nor the statements made to the Drug Enforcement Agency ("DEA") agents, can be used at trial against Mario Arreola-Alvarado.

## STATEMENT OF FACTS

Mr. Arreola-Alvarado is charged with one count of Possession with Intent to Distribute, in violation of 21 U.S.C. § 841. This charge stems from the events of Halloween night beginning at 11:30 PM, when DEA agents went to Defendant's home after arresting Marco Andrade and Alex Leyva, two other individuals thought to be working with Defendant for the same drug trafficking organization. Both parties agree that 1) between seven and nine agents went to Defendant's home, 2) the agents did not have a search warrant or arrest warrant, 3) the agents carried weapons, and a number of them wore military-style raid gear, when they

approached Defendant's house, and 4) it took at least 20 minutes for Defendant and/or Monica to consent to a search of the garage after no drugs were found in the house. It is also undisputed that the DEA had been investigating Andrade, Leyva, and the Melrose Street residence for approximately six months. The DEA's information linked Andrade and Leyva to a drug trafficking organization that moves large quantities of cocaine and heroin from Mexico into the U.S. They also knew from prior surveillance that certain individuals under investigation were associated with 836 Melrose.

At approximately 6:30 PM on October 31, DEA agents observed a meeting between Andrade and Levya. The agents subsequently conducted two vehicle stops and recovered more than one kilo of heroin from Andrade. According to Special Agent Michael Brouillard, Andrade and Levya provided information that led the agents to Defendant's home. Although neither Leyva nor Andrade could alert anyone within the organization at that point, Agent Brouillard did not feel he could wait to act on the tip and decided at some time between 9 and 10 PM to go to 836 Melrose.

The agents arrived at Defendant's home – which was described as small and less than 1000 square feet in size – in unmarked police vehicles at approximately 11:30 PM. At that time, the agents had their suspicions about the residence but

were unsure of who lived there. The flashing lights on the top of a marked Michigan State Police K-9 police vehicle, which was also present at the scene, remained on throughout the course of the encounter.

All of the agents at Defendant's home that night were armed and several wore raid gear and helmets. Special Agent Jim O'Neil said that his gun was pointed at the windows of the house prior to entry. Brouillard confirmed that someone looking out of the window would have seen the agents pointing their guns at the home. Some of the agents shined flashlights into the house.

The parties dispute the facts surrounding the agents' initial entry into Defendant's residence, whether consent to search the house and garage were separately given, and if so, whether that consent was voluntary. The Court will examine the testimony of the Defendant's witness, Monica Alvarado, and the testimony of the Government witnesses, Agents Brouillard, Scott Czopek, and Jim O'Neil.

**A. The Testimony of Monica Alvarado**

Defendant woke up his wife, Monica, after hearing banging on the front door of his home. When Monica walked to the living room and looked out of the window, she saw "a line-up of men pointing guns at me," and felt "shocked and scared and confused." (Tr. at 177:1-4). The agents demanded that Defendant open

the door and threatened to knock it down. Although Monica protested, Defendant obeyed because he was concerned that the agents would scare his children.

Agent O'Neil and another agent walked inside as soon as Defendant opened the front door. They had their guns drawn out and aimed towards Monica and Defendant as they entered, and they immediately began asking, "what's your legal status, what's your legal status?" *Id.* at 179:18-20. They said that they needed to do a welfare check, and proceeded to walk through the house. Monica did not remember whether they asked permission to do this. The other agents "rushed in and they were all pointing high magnitude rifles at us." *Id.* at 182:2-5. Monica "put [her] hands up because [she] got scared and it was very confused." *Id.* at 182:5-6. She did not remember exactly how many agents were present, but testified that "[i]t looked like a small army had walked into the house." *Id.* at 182:11-12.

Monica first ordered the agents to leave after they concluded their walk-through of the house. They refused and demanded to be allowed to search the garage. Monica asked them to produce a search warrant. The agents then gave to Monica a document indicating that she consented to the search. Monica refused to sign it and said, "I want everybody in this room to know . . . the reason why I'm not signing this . . . piece of paper [is] because I have been threatened. I have been bullied and I was harassed." *Id.* at 189:18-21.

After Monica told Agent O'Neil that he needed a warrant to search the garage, he said, "we're going to do things the hard way . . . we're going to call immigration on you and they're going to take you away . . . we're also going to take your children away. And we will obtain that search warrant and . . . we're going to destroy your house from the ground up." *Id.* at 190: 4-14. O'Neil did not believe Monica after she informed him that she was a U.S. citizen, so she gave him her driver's license and Concealed Pistol License ("CPL"). Still, she felt uneasy; "[h]ere I am in my home with all these men pointing guns at us and telling me that they're going to take my children." *Id.* at 192:23-25. She then walked up to O'Neil, pointed to him, and said,

> I want all of you mother Fers out of my house right now, no one's going to come to my home and threaten me, tell me they're going to take my children away, accuse me of being an illegal immigrant . . . and still doubt me when I show you my identification.

*Id.* at 193:11-17. In response to O'Neil's threat of arrest, Monica said,

> I don't give a damn what you do. But you get out of my house right now. Go ahead and do whatever you have to do but get the hell out of my house because no one's going to come in my house and threaten me or my children or question my illegal status.

*Id.* at 193:19-23. Monica continued asking the agents why they would not leave and said, "[a]s far as I'm concerned, you['re] trespassing [in] my house because I've asked you to leave my house." *Id.* at 194:9-12.

Monica eventually gave two agents permission to do a walk-through of the garage, accompanied by Defendant, because she "was tired of fighting and nobody was listening to me." *Id.* at 198:8-9. The officers said that once they obtained a search warrant, "it was going to get very ugly." *Id.* at 196:14-15. Monica could not believe that she had "been threatened and I've repeatedly asked [the agents] to leave my home and no one's listening to me." *Id.* at 196:23-25.

### B. The Testimony of the DEA Agents

Between seven and nine agents went to Defendant's home on the night of October 31. When they arrived at Defendant's house, they knocked on the front door and announced themselves to be police. The agents did not bang on the door, but knocked "[a] little bit louder than [ ] normal." *Id.* at 31:1. Agent Brouillard estimated that Defendant would have been able to see at least five agents, all of whom had their guns drawn, when he opened the door. Defendant was shirtless and seemed confused. He asked the agents, "what's going on?" *Id.* at 34:8-9. Agent Brouillard asked if they could come inside the house to explain and Defendant said, "yes, it's okay." *Id.* at 81:24-25.

Agent Brouillard told Defendant that the agents had information that drugs were being stored at 836 Melrose. Defendant denied this to be true. Brouillard asked if the agents could search the house. Defendant and Monica said yes.

Defendant accompanied the agents during the walk-through. The agents checked the children's bedroom to ensure that no one who posed a threat was in the home. The children remained asleep throughout the agents' presence in the house. The agents holstered their weapons or returned them to their vehicles once it became clear that no threat was present.

Brouillard "was happy with [his] communications" with Defendant up to that point because Defendant had been very cooperative. *Id.* at 42:16-17. When everyone returned to the kitchen, the agents asked Defendant and Monica if they could search the garage. This request gave Defendant pause and he hesitated before answering. In fact, it took approximately 20-30 minutes for Defendant and/or Monica to respond to the request. Defendant and Monica began speaking to each other in Spanish. Czopek confirmed that the agents asked for consent to search the garage multiple times. He also said: "each time I would ask him for consent to search the garage, [Defendant] would look at [Monica], sometimes they would just stare at each other without saying anything. It appeared that he was trying to get her permission to allow us to search. He was looking at her for guidance maybe." *Id.* at 137:21-25. Agent Brouillard said that Defendant "had paused and . . . looked in the direction towards Monica and said 'Monica,' and that's when silence came." *Id.* at 104:6-9. Defendant did not give consent the first time he was asked and "in

order to obtain consent, [Brouillard] asked in different ways." *Id.* at 104:21-23. Monica, too, was hesitant; "she was silent after [the] question" and "there was no response." *Id.* at 105:9-17. Czopek said that Defendant and Monica asked a lot of questions and "didn't understand why we were there." *Id.* at 147:23-25.

Agent Brouillard said that after asking if the agents could search the garage, "it was kind of quiet . . . so we started asking some questions . . . as far as identification." *Id.* at 48:10-12. O'Neil asked Monica if she was a citizen and she became "very agitated." *Id.* at 156:22. She pushed his chest with her hand and said, "you can get the fuck out of my house." *Id.* at 157:1-2. O'Neil told Monica not to touch him and he subsequently left the house with Agent Brouillard. Between three and five agents remained in the house with Defendant and Monica.

Defendant and Monica eventually told the group that only two agents could search the garage at a time and Defendant wanted to be present to watch the search. Defendant left the house with Czopek and Agent Crop.

Defendant's garage was highly secure. Attached to the frame of the door to the garage was a locked metal security gate. There was also a deadbolt on the door. After Czopek and Crop entered the garage with Defendant, Defendant locked the metal gate behind him. Agents outside of the gate were able to see and talk to

Defendant, who stood near the open door as the agents searched. Czopek said that Defendant helped with the search.

The agents found a Food Saver machine and bag inside the garage, but did not locate any drugs. They then asked Defendant if they could bring a drug-sniffing dog into the garage. Defendant hesitated and said that he was scared of the dog, but eventually agreed. Defendant continued speaking with Brouillard after the dog was inside. The K9 officer told Czopek that the dog had alerted him in the area of a work bench that turned out to have a hidden space inside it. Czopek found seven kilograms of heroin and one kilogram of cocaine inside the bench.

Brouillard advised Defendant of his *Miranda* rights and questioned him on the scene. Defendant said, Monica "has nothing to do with it, it's mine." *Id.* at 62:4-5.

## ANALYSIS

**I.     The consent provided to the DEA agents was invalid.**

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

Courts have long recognized that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). This presumption of unreasonableness may be defeated by a showing that a specific exception to the Fourth Amendment warrant requirement applies. The exception at issue here is Defendant's alleged consent to the search. Defendant argues that the consent provided by himself and/or by Monica was involuntary because it was the result of the officers' coercion and duress.

Voluntary and valid consent – meaning consent that is "unequivocally, specifically, and intelligently given, uncontaminated by any duress or coercion" – is a well-established exception to the Fourth Amendment warrant requirement. *United States v. Worley*, 193 F.3d 380, 385-86 (6th Cir. 1999). It is the Government's burden to show consent "by a preponderance of the evidence . . . [and] through clear and positive testimony." *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996) (internal quotations omitted).

Courts determine whether the consent was voluntary by examining the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). Defendant's characteristics – including his "age, intelligence, and education; whether [he understood] the right to refuse to consent; whether [he understood] his . . . constitutional rights" – and the details of the detention –

including "the length and nature of detention[ ] and the use of coercive or punishing conduct by the police" – are relevant to the voluntariness analysis. *Riascos-Suarez*, 73 F.3d at 625. "[I]ndications of 'more subtle forms of coercion that might flaw [an individual's] judgment'" are also critical to consider. *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)). The Court must determine whether Defendant's "will has been overborne and his capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 255; *see also United States v. Hardeman*, 36 F. Supp. 2d 770, 777 (E.D. Mich. 1999).

The Government and Defendant sharply disagree over whether Defendant and/or Monica consented to the agents' entry into the residence and their request to search. Assuming for the moment that the Court accepts the Government's contention that Defendant permitted the agents to enter the house, it still must be determined whether in fact Defendant did so voluntarily.

The agents in this case used the knock and talk procedure, a "consensual encounter[] [and] legitimate investigative technique at the home of a suspect or an individual with information about an investigation." *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005). Knock and talk is designed to obtain a suspect's consent to search, and law enforcement "may initiate a knock and talk without any

objective level of suspicion." *Pritchard v. Hamilton Twp. Bd. of Trs.*, 424 Fed. Appx. 492, 499 (6th Cir. 2011). The use of the knock and talk is one of the circumstances the Court considers "in evaluating whether consent was given and, if so, whether consent was given voluntarily." *Hardeman*, 36 F. Supp. at 778. Because the law enforcement officers here sought entry into Defendant's home, where he enjoys the utmost expectation of privacy, "the Court must closely scrutinize any warrantless search of a residence, and carefully examine any purported consent for signs of coercion or duress." *Id.*

At 11:30 at night on October 31, Defendant and Monica were asleep in bed. Defendant awoke suddenly to the sound of loud knocking on his front door. Defendant and Monica saw a group of uniformed men, holding guns and shining flashlights into their windows, standing outside their front door. When Defendant opened the door, he found himself face to face with a group of at least five DEA agents, all of whom had unholstered their weapons. He also would have seen the Michigan K9 unit, which, as Special Agent Brouillard testified, had its flashing lights on. This was a police-dominated atmosphere. Facing a group of uniformed law enforcement officers with rifles and pistols drawn, some aimed at the windows of the house, late at night, is undoubtedly intimidating for a civilian, and more importantly, is so overbearing as to be coercive. The Court finds that an objectively

reasonable person in Defendant's position would not have felt free to decline the agents' request to search. Any permission to search "was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right." *Johnson v. United States*, 333 U.S. 10, 13 (1948).

A defendant's Fourth Amendment rights are violated when law enforcement act with "such a show of authority that [the] Defendant reasonably believed he had no choice but to comply." *United States v. Saari*, 272 F.3d 804, 804 (6th Cir. 2001). Given the details described above, and furthermore, that the agents never informed Defendant or Monica that they could refuse to consent to the search,[2] the Court finds that Defendant had no real say in the matter, and therefore any consent he gave to the search the house was invalid. The agents' violation of Defendant's rights also taints the alleged consent to search and search of the garage.

Defendant's and Monica's hesitation after being asked whether the DEA agents could search the detached garage is also key. Neither Defendant nor Monica consented until at least 20 minutes after the agents' initial request to search the garage. This prolonged hesitation and uncertainty on the part of both Defendant

---

[2] "[A]lthough law enforcement officials are not required to inform criminal suspects of their right to refuse consent to a search, 'knowledge of the right to refuse consent is one factor to be taken into account.'" *Worley*, 193 F.3d at 386-87 (quoting *Schneckloth*, 412 U.S. at 227)).

and Monica indicates that the consent was not unequivocal, and reinforces the conclusion that the fruits of the searches – the drugs and Defendant's alleged statements – must be suppressed. It is also important that Defendant appeared confused when he first saw the agents, and asked, "what's this about, what's going on?" (Tr. at 34:8-9). The fact that Defendant and Monica continued asking questions throughout the incident further indicates that they did not fully understand the situation. *See Riascos-Suarez*, 73 F.3d at 625.

The agents' testimony also illustrates that the persistent questioning wore Monica and Defendant down. Brouillard and Czopek stated that they sought consent multiple times and attempted to obtain it in different ways. That Monica eventually gave in because she was tired of fighting and being ignored demonstrates that the consent was "merely a response conveying an expression of futility in resistance to authority." *Worley*, 193 F.3d at 386.

II. **The DEA agents impermissibly created exigent circumstances to justify their warrantless entry into Defendant's residence.**

The Government claims that the agents were confronted with "a ticking" clock after arresting Andrade and Leyva, and that it was reasonable for them to proceed immediately to 836 Melrose. (Tr. at 155:3). The record in this case belies the Government's argument. Law enforcement officials "are not free to create exigent circumstances to justify their warrantless searches." *United States v.*

*Campbell*, 261 F.3d 628, 633 (6th Cir. 2001). Agent Brouillard stated that the DEA had been conducting surveillance of 836 Melrose for several months before October 31. Although the agents did not know anything about the person who lived there, surveillance revealed enough for them to know that the garage was their primary target and that other individuals under investigation were associated with the residence. Furthermore, they had ample time to secure a search warrant before proceeding to Defendant's residence. Brouillard decided at some point between 9 and 10 PM to go to Defendant's house; however, the agents did not actually arrive there until 11:30 PM. That window – between 9 or 10 PM and 11:30 PM – afforded the agents sufficient time to call in and obtain warrant. *See Missouri v. McNeely*, 185 L. Ed. 2d 696 (2013) (technological advances enable law enforcement "to secure warrants more quickly . . . without undermining the neutral magistrate judge's essential role as a check on police discretion."). The Court finds that "alternative courses of action were available to the officers [and] that no real immediate and serious consequences would certainly occur by the failure to enter [Defendant's] residence" at 11:30 PM on October 31. *United States v. Williams*, 354 F.3d 497, 506 (6th Cir. 2003) (internal quotations omitted).

Additionally, there was no activity at Defendant's house when the agents arrived. The lights in the house were off, it was quiet, and they did not see anyone

looking out of the windows. The Government has presented no evidence "demonstrat[ing] a need for immediate action that would have been defeated if the . . . [DEA agents] had taken the time to secure a warrant." *United States v. Rohrig*, 98 F.3d 1506, 1518 (6th Cir. 1996). Here, speed was not essential and there were no exigencies present that made it imperative for the agents to enter Defendant's home without a warrant. *See Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 298-99 (1967).

## CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence [22] is **GRANTED**. The evidence seized from 836 Melrose Street, and the statement made to the DEA agents, on October 31, 2016, cannot be used at trial against Defendant Mario Arreola Alvarado.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: June 6, 2017　　　　　　　　　　Senior United States District Judge

CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S Mail addresses disclosed on the Notice of Electronic filing on June 6, 2017.

                                            s/Teresa McGovern
                                            Case Manager Generalist